UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------ x
SHUTTERFLY LIFETOUCH LLC,                        :
                                                 :
                        Plaintiff,               :
                                                 :       **MEMORANDUM &**
           -against-                             :       **ORDER**
                                                 :
TIMOTHY ROSA,                                    :       3:21-CV-00666 (VDO)
                                                 :
                        Defendant.               :
------------------------------------------------------------------ x

**VERNON D. OLIVER**, United States District Judge:

Plaintiff Shutterfly Lifetouch, LLC sued Defendant Timothy Rosa, a former employee, for complications relating to his employment contract. It brought claims related to Rosa's alleged breach, requesting pre-determined liquidated damages and actual damages in the form of lost profits, among other forms of relief. Rosa responded with affirmative defenses and counterclaims based on his own reading of the contract, also requesting various relief. Both Shutterfly and Rosa have filed cross-motions for partial summary judgment, each taking issue with the other's reading of the contract. For the following reasons, the Court grants both motions.

**I.     BACKGROUND**

    **A.     Factual Background**

Defendant Timothy Rosa is a long-time school photographer. After working in his own business, Lens, Inc., for approximately four years, he began an association with T.D. Brown, Inc., as an independent contractor in 1997. There he signed an Independent Sales Representative Agreement ("TDB Agreement"). The following year, Lifetouch National Schools Studios Inc. acquired T.D. Brown and Rosa became Lifetouch's employee. With the

change of employment came a change of contract, the Sales Representative Agreement ("SRA"). Finally, in 2018, Shutterfly, Inc., acquired Lifetouch.

In the years after it acquired Lifetouch, Shutterfly made unilateral changes to the terms and conditions of Rosa's employment. It furloughed him in 2020. It then moved him from commission-based pay to a salary with bonuses. Rosa claims that at the time of the furlough, Shutterfly owed him commissions on Package and Merchandise sales already secured. Eventually Rosa resigned in 2021, claiming entitlement to unpaid commissions.

Shutterfly claims that after he left, Rosa began soliciting schools to leave the company behind and be serviced by him. Rosa claims that his associations with these customer schools predate any of the relevant contractual relationships and thus fall outside any contractual noncompete provisions.

**B.      Procedural History**

Because of the alleged solicitation, Shutterfly sued Rosa. The company claimed breach of contract (count one), breach of fiduciary duty (count two), unjust enrichment (count three), declaratory judgment (count four), and accounting (count five). It requested (1) liquidated damages equal to 180% of revenues the company earned from schools serviced by Rosa during a twelve-month period (close to four million dollars) and (2) five years of lost profits (a little over five million dollars), along with declaratory relief and the costs of litigation. (ECF No. 1)

Rosa answered by disputing all claims and taking issue with some of the facts in the Complaint. He asserted many affirmative defenses: failure to state a claim, time bars, prior breach, lack of damages, frivolity and harassment, good faith, setoff and recoupment, failure to mitigate, and lack of entitlement to damages. He further asserted the defenses of public policy, overbreadth, vagueness, and unreasonableness; the doctrine of waiver, release, accord

and satisfaction; failure of consideration; unclean hands; selective enforcement; laches; and/or estoppel. Finally, he asserted counterclaims of breach of contract (count one), breach of the covenant of good faith and fair dealing (count two), violation of Conn. Gen. Stat. § 31-71a *et seq*. (count three), and declaratory judgment (count four). (ECF No. 30)

### C. Summary Judgment Motions

Rosa moves for summary judgment on Shutterfly's claims for breach of contract, breach of fiduciary duty, unjust enrichment, and accounting. He argues that Shutterfly's alternative damages theory claims—liquidated damages or actual damages in the form of lost profits—fail as a matter of law, defeating its contractual claims.

Shutterfly moves for summary judgment on Rosa's primary defense: that his original contract with T.D. Brown excluded certain customers from the non-compete provisions. It argues that the relevant agreement terminated his original contract, making any exclusion inapplicable. The company also moves for summary judgment on Rosa's four counterclaims, which it argues stem from a misreading of the relevant contract and thus fail as a matter of law.

## II. LEGAL STANDARD

A court will grant a party summary judgment if they can show that there is no dispute of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are those that would "affect the outcome" of a case; not all facts in contention are material. *Aetna Life Ins. Co. v. Big Y Foods, Inc.*, 52 F.4th 66, 72 (2d Cir. 2022). A genuine dispute exists if a reasonable factfinder could, based on the evidentiary record, find for the nonmoving party. *Id*. The burden to show the absence of such a dispute lies with the moving party. Once the moving party has met their burden, courts will review the facts "in the light

most favorable" to the nonmoving party. *New York v. Mountain Tobacco Co.*, 942 F.3d 536, 541 (2d Cir. 2019). The court then applies the law to determine whether the moving party is entitled to judgment in their favor. *Id*. Questions of contract interpretation are matters of law reviewable at summary judgment. *See, e.g.*, *Hunt v. IBM Mid Am. Emps. Fed. Credit Union*, 384 N.W.2d 853, 856 (Minn. 1986).

Cross-motions for summary judgment do not change the standard. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). A court reviewing cross-motions must still determine whether either party deserves judgment as a matter of law based on each motion's merit. *Id*.

## III.    DISCUSSION

### A.    Applicable Law

Before this Court can resolve the motions, it must first determine which body of law applies. The SRA contains a choice-of-law provision making Minnesota law govern disputes. (SRA § VII.B).

A contract's choice-of-law provision is usually followed unless one of two exceptions apply: (1) the chosen state has no relation to the contract, or (2) the chosen state's law would run contrary to a more relevant state's policy. *Elgar v. Elgar*, 679 A.2d 937, 943 (Conn. 1996). Minnesota being Shutterfly's place of incorporation and principal place of business makes both exceptions inapplicable. *Elizabeth Grady Face First, Inc. v. Escavich*, 321 F. Supp. 2d 420, 423 (D. Conn. 2004); (ECF No. 111).

Rosa, however, contests the choice-of-law provision's applicability in filings for both motions. He argues that Connecticut choice-of-law rules dictate that, where two states' laws are analogous, the forum's law applies. (Def. Opp., ECF No. 111 at 2 (citing *Cohen v. Roll-A-*

*Cover, LLC*, 131 Conn. App. 443, 465 (Conn. App. 2011)).) He further contends that no outcome-determinative difference exists between Connecticut and Minnesota law, so the former should apply. If this were a common law dispute or the SRA contained no choice-of-law provision, Rosa would be correct. But Rosa's understanding of the choice-of-law analysis is backwards: a choice-of-law provision applies unless there is reason for it not to. Here, he has presented no such reason,[1] and none exists. Minnesota law applies.

### B.  The SRA's Damages Provisions

Rosa's motion rises and falls based on his argument that Shutterfly's damages claims are unenforceable, thus rendering the company's claims moot. He contends that the damages demands amount to "having your cake and eating it too," as the contract would allow for a court to award Shutterfly liquidated damages *and* actual damages which, he argues, is unconscionable.

Rosa's argument proceeds in two parts. In the first, he attacks the damages provisions conjunctively. He argues that the SRA's damages provisions (§§ VI.B and VI.C) are unenforceable because they unlawfully allow Shutterfly to pursue both actual and liquidated damages. In the second, he attacks the damages provisions disjunctively. He contends that the

---

[1] The cases Rosa cites do not help him. *Cohen* involved a tort dispute, and a question of which state felt the effects of that tortious conduct most. *Hart v. World Wrestling Entm't, Inc.*, 2012 U.S. Dist. LEXIS 43184 (D. Conn. Mar. 28, 2012), is also unhelpful. First, the opinion he cites was amended and superseded by another (unpublished) decision—its text has even been removed from Westlaw. Second, in that case, the court applied state choice-of-law rules specifically because a contract's choice-of-law provision did not apply to the specific tort dispute at issue. *Hart v. World Wrestling Entm't, Inc.*, 2012 WL 1233022, at *6 (D. Conn. Apr. 10, 2012). The court would have otherwise relied on the COL provision. *Id*. A final (unpublished) case, offered by counsel at argument, is also unhelpful. There, the defendant directly challenged the legal validity of a choice-of-law clause, something Rosa refrains from doing here. *Doctor's Assocs. v. Tripathi*, 2016 U.S. Dist. LEXIS 177595, at *42 (D. Conn. Nov. 3, 2016).

demand for liquidated damages alone is invalid as a means of calculating damages for breach. He then claims that Shutterfly's calculation of actual damages, in the form of lost profits, is unreasonably speculative and thus unenforceable. For the reasons below, the Court agrees.

### 1. The Conjunctive Reading

Liquidated damages provisions are generally enforceable under Minnesota law. *Gorco Const. Co. v. Stein*, 99 N.W.2d 69, 74 (Minn. 1959). As in many states, courts enforce these clauses when "1) 'the fixed amount is a reasonable forecast of just compensation for the harm caused by the breach,' and 2) 'the harm is incapable or very difficult of accurate estimation.'" *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 472 (8th Cir. 2004) (quoting *Bellboy Seafood Corp. v. Nathanson*, 410 N.W.2d 349, 352 (Minn. Ct. App. 1987)). Such provisions are particularly useful when "damages include items such as goodwill and loss of profits, which can be difficult to evaluate." *Winthrop*, 361 F.3d at 472. Given their usefulness in calculating the potentially incalculable, liquidated damages provisions are generally seen as obviating the need to prove actual damages. *Id.*; *see also Lagoon Partners, LLC v. Silver Cinemas Acquisition Co.*, 999 N.W.2d 113, 120-121 (Minn. App. Ct. 2023); 24 Williston on Contracts § 65:1 (4th ed.). By inverse reasoning, liquidated damages provisions that allow for the collection of actual damages *in addition to* liquidated damages are seen as unnecessarily punitive. 24 Williston on Contracts § 65:1 (4th ed.).

Rosa argues that the conjunctive language in the SRA allows for the collection of either liquidated or actual damages, or both. The "or both" creates the real problem here: the possibility of Shutterfly being able to claim both would render the provision unnecessarily punitive. Rosa bases his argument in §§ VI.B and VI.C of the SRA. Section VI.B provides, in relevant part:

6

> [In the event of a breach involving non-solicitation (§ II.B.) of a customer] Employee shall pay to Lifetouch as liquidated damages an amount equal to 180% of all revenues received by Lifetouch from that customer during the twelve (12) months preceding the termination of Employee's employment with Lifetouch.

Section VI.C provides, in relevant part:

> Lifetouch and Employee also acknowledge and agree that in the event of a breach… Employee agrees to pay Lifetouch: (1) all reasonable attorneys' fees and costs that Lifetouch incurs in seeking enforcement of this Agreement; and (2) all remedies allowed by law, including but not limited to actual compensatory, consequential, and punitive damages.

From these two provisions, Rosa reads the SRA as allowing Shutterfly to seek both liquidated and actual damages for breach; the former under VI.B, the latter under VI.C, and neither with limiting language. Section IV.B, the liquidated damages provision, applies only to issues of solicitation; express violations of § II.B. The problem, however, arises from the expansive nature of § IV.C. That provision allows Shutterfly to seek damages for "a breach of *any* provision" (emphasis added). This would include a breach of § II.B, thus allowing the company to seek actual damages and the liquidated damages in § IV.B. Such a reading is also supported by language in both provisions: "Employee shall pay" in IV.B and "Employee agrees to pay" in IV.C. There is no language in either directed at Shutterfly or including the idea of a choice: if an Employee breaches II.B, they "shall pay" liquidated damages, and if they breach *any* part of the SRA, including § II.B, they "agree to pay" any damages allowable by law.

Shutterfly calls this a misreading of the SRA. It contends that the contract limits its ability to collect both types of damages because § VI.C includes the phrase "all remedies allowable by law." This seemingly boilerplate language, in the company's view, actually prevents the company from pursuing unlawful damages—like the pursuit of liquidated *and*

7

actual damages. But the company pursued both in its Complaint, only changing its tune at summary judgment. That the SRA's capacious language allows for the pursuit of both types of damages is sufficient to find it unenforceable. 24 Williston on Contracts § 65:1 (4th ed.).

### 2. The Disjunctive Reading

While the conjunctive reading of the damages provisions renders them unenforceable, it is worthwhile for the Court to consider the provisions disjunctively. The first question is whether the SRA's liquidated damages calculation formula is viable on its own. The next is whether Shutterfly's calculation of actual damages, in the form of lost profits, is sufficient to support its claim.

#### a. Liquidated Damages

As noted above, Minnesota law typically supports the enforceability of liquidated damages provisions. *Gorco*. Such provisions are useful when "1) the fixed amount is a reasonable forecast of just compensation for the harm caused by the breach, and 2) the harm is incapable or very difficult of accurate estimation." *Winthrop*, 361 F.3d at 472 (cleaned up).

The SRA covers these bases, as § IV.B states:

"Lifetouch and Employee acknowledge that this liquidated damages provision: (1) is necessary because of the difficulty in ascertaining the precise amount of damages Lifetouch may incur as a result of a breach of the non-competition agreement and the subsequent loss of a Customer; and (2) is based on Lifetouch's business, the value, type and quality of Lifetouch's Customers, the substantial time, effort and cost which Lifetouch has incurred in developing and maintaining such Customers, and various other factors."

The touchstone of the analysis to determine the enforceability of a liquidated damages provision is proportionality. *Lunda Constr. Co. v. County of Anoka*, 2019 WL 178511 at *6 (Minn. App. Ct. Jan. 14, 2019) (citing *Gorco* at 74-75). Courts ask "whether the amount agreed

upon is reasonable or unreasonable in the light of the contract as a whole, the nature of the damages contemplated, and the surrounding circumstances." *Gorco*, at 74.

Section VI.B awards liquidated damages equal to 180% of revenues gained from a customer in a given year. Minnesota courts have routinely held enforceable liquidated damages provisions that exceed a single multiple of prospective lost profits or value. (Pl. Opp., ECF No. 111 at 13-15 (collecting cases) (e.g., *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1369-70 (8th Cir. 1991)).) But § VI.B's damages equation focuses on *revenue*, not profit. That kind of calculation fails to include the costs of servicing a customer, and Shutterfly cites no Minnesota case[2] to support its argument. In fact, by Shutterfly's own admission, each of those cases calculated damages based on profit, not revenue. *See, e.g.*, *Winthrop Resources Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 472 (8th Cir. 2004); *Overholt Crop Ins. Serv. Co.*, 941 F.2d at 1370. That lack of proportionality makes the liquidated damages calculation in IV.B *prima facie* disproportionate and thus unenforceable under Minnesota law.

### b. Actual Damages

Proof of a lost profits claim need not reach "absolute certainty" under Minnesota law. *Cardinal Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260, 266 (Minn. 1980) (internal citation omitted). Plaintiffs must allege an amount within "reasonable probability." *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 920 (Minn. 1990).

---

[2] Shutterfly cites two unpublished cases from Connecticut that involve revenue. (ECF No. 111) The first, a Superior Court case from 1995, concerned an insurance agent's commissions, not company revenues. *Daniel V. Keane Agency, Inc. v. Butterworth*, 1995 WL 93387, at *8 (Conn. Super. Feb. 22, 1995). It was never followed again. The second, a Superior Court case from 2009, declined summary judgment on the liquidated damages provision question because a genuine dispute of material fact existed. *Webster Fin. Corp. v. Levine*, 2009 WL 1056564, at *4 (Conn. Super. Mar. 24, 2009). The case explicitly avoids opining on the legality of the provision, and is, at best, unhelpful here.

Shutterfly produced a damages spreadsheet containing details of revenues received prior to Rosa's departure, from each of its former customers now serviced by Rosa.(ECF No. 103-1) It further included itemized received-payment spreadsheets for each of those customers. Shutterfly includes no expert analysis, arguing that a jury could reasonably calculate the lost profits itself.

Rosa argues that the damages spreadsheet is inadmissible hearsay. The company admits that the spreadsheet was created for the purpose of litigation and not in the normal course of business, which does not meet the business records exception. *United States v. Feliz*, 467 F.3d 227, 237 (2d Cir. 2006) ("[Rule 803(6)] excludes documents prepared for the ultimate purpose of litigation."); *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943). Further, the spreadsheet itself is based on other spreadsheets that were also not created in the course of business and were not included in evidence, making the damages spreadsheet inadmissible under Fed. R. Evid. 1006. *See Fagiola v. Nat'l Gypsum Co. AC & S., Inc.*, 906 F.2d 53, 57 (2d Cir. 1990) (summaries admitted under [Rule 1006] must be based on already admitted evidence).

The other major piece of evidence Shutterfly includes to prove lost profits is a profit-and-loss statement from 2021. (ECF No. 103-1) Rosa argues that this statement is also inadmissible, noting that the document was produced after the close of discovery and at summary judgment. Shutterfly responds that Rosa's suggestion that the company did not produce evidence of its profit margins in discovery is specious, because Rosa did not ask for them. But Shutterfly, as Plaintiff, has an obligation to prove its lost profits even if Rosa failed to ask it to. *B & Y Metal Painting, Inc. v. Ball*, 279 N.W.2d 813, 816 (Minn. 1979). It did not, and the statement is inadmissible under Rule 803(6). Shutterfly thus lacks evidence to support its claim for actual damages, making it too speculative to pursue.

C.  **Rosa's Counterclaims**

Shutterfly claims that Rosa's counterclaims fail because the SRA allowed it to unilaterally alter his compensation structure, thus negating his claims related to those changes. The SRA provides the following regarding compensation:

> "Lifetouch shall compensate Employee for Employee's services as Sales Representative in accordance with the compensation schedule attached as Exhibit A, which may be updated and modified from time to time by Lifetouch." § I.B.

> "For a period of 90 days from the effective date Employee will be paid the net compensation he earned as an independent contractor of T.D. Brown, Inc. pursuant to the [T.D. Brown Agreement] …. Thereafter, the parties will agree to a compensation formula similar to that of other comparable Lifetouch employees." Exhibit A.

Shutterfly argues that § I.B's use of the language "updated and modified from time to time by Lifetouch" allows it to unilaterally modify an employee's compensation structure without their consent. Rosa does not contest this. Rather, he points to § I.B's invocation of Exhibit A to argue that his consent is required for that modification. Specifically, he points to Exhibit A's use of "will agree" to argue that, after the initial 90-day period specified, any compensation modification would call for his agreement. Such a reading tortures the language. Read as a whole, Exhibit A set out that Rosa would be paid under his previous contract for 90 days. Then, he and Shutterfly would agree at the end of those 90 days—hence, "thereafter," which responds to the 90-day period—on a permanent compensation structure; that is, until Shutterfly "update[s] and modifie[s]" it.

In the alternative, Rosa argues that Shutterfly waived its argument because it tried to negotiate a new compensation structure with him after unilaterally changing it. Waiver is "the intentional relinquishment of a known right." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764

N.W.2d 359, 367 (Minn. 2009) (cleaned up). It is a factual question, one that can be implied by conduct if not expressed explicitly. *Id*. Rosa contends that Shutterfly's attempt to negotiate with him was an implied waiver. But, as Shutterfly notes, it did so after expressly reiterating its belief that it could unilaterally modify his compensation. (ECF No. 131) That alone is enough to defeat an implication of waiver. Rosa's counterclaims thus fail.

D.      **Rosa's Primary Defense**

Finally, Shutterfly's motion contends with what it calls Rosa's Customer-Exclusion Defense. (ECF No. 108) It argues that the defense—Rosa's claim that the SRA imported provisions of the TDB Agreement excluding certain customers from its noncompete—is an incorrect reading of the SRA. The Court need not discuss the noncompete itself at this stage, as Rosa does not contend that he followed its restrictions. Rather, Rosa relies on the so-called Customer-Exclusion Defense to argue that he did not, and could not, breach the noncompete by servicing certain customers.

Questions of contract interpretation are questions of law, not fact. *Hunt*, 384 N.W.2d at 856. Shutterfly argues that the terms of the SRA unambiguously invalidate Rosa's exemption defense. Rosa disputes this, arguing that the terms unambiguously support his exemption defense or are, at minimum, ambiguous enough to be inappropriate for summary judgment. Even if Shutterfly is correct, Rosa contends that such a reading of the SRA would render its noncompete unenforceable.

The SRA by its terms, and by understanding of the parties, terminates the T.D. Brown Agreement.

> "Employee acknowledges the Independent Sales Representative Agreement between Employee and T.D. Brown, Inc. dated February 8, 1997 ("TDB Agreement") and the termination thereof by this Agreement; . . . Employee

12

acknowledges a continuing obligation under the restrictive covenants contained in the TDB Agreement, including but not limited to the noncompetition agreement and the confidentiality agreement, for the benefit of Lifetouch." SRA § VII.F.

This provision explicitly binds Rosa to the TDB Agreement's noncompete. That provision, in addition to standard noncompete language, reads:

> For a period of two (2) years immediately following the date of termination of this agreement, the Rep shall not [engage in competitive behavior]. Whether directly or in a supervisory or advisory capacity, on behalf of the Company or any associated company during a one (1) year period immediately preceding termination of the Rep Agreement by the Company, said limitation to apply within the State of Connecticut, and those additional accounts . . . excepting, however, those accounts which the Rep has brought "to the Company and exhibited on Schedule "B"[.]"

T.D. Brown Agreement § 6.

Schedule B of the TDB Agreement[3] includes a list of customers Rosa brought from his previous businesses, a list not in the record. Shutterfly argues that these provisions, taken together, amount to nothing more than an expired extension of a now-dead contract.

Shutterfly is correct. SRA § VII.F maintained the TDB Agreement's noncompete restrictions, on top of the SRA's noncompete restrictions, for two years—not in perpetuity. Section 6 of the TDB Agreement sunsets by its own terms two years after the Agreement's termination. That termination took place when the SRA took effect, and the SRA thus extended § 6 for two years beyond that. By transitive reasoning, the Schedule B exemption contained in § 6 also sunset two years after the SRA terminated the TDB Agreement.

Rosa's argument differs in temporal scope; he reads SRA § VII.F as maintaining TDB Agreement § 6, in both restriction and exemption, in perpetuity. The only language that would

---

[3] Exhibit B elsewhere. It is unclear why it is referred to as both "Schedule B" and "Exhibit B."

13

plausibly allow for such a reading comes from the word "continuing" in SRA § VII.F. That section states that the employee acknowledges a "continuing" obligation under § 6. But Rosa does not argue this. Even if he did, Section VII.F's use of the word "obligation" following "continuing," and its final clause ("for the benefit of Lifetouch") would undermine any reliance on "continuing." Rather, Rosa argues that, because he understands the law to prevent noncompetes from affecting "pre-existing relationships," his reading would maintain the SRA's enforceability.[4]

The next question, then, is whether Shutterfly's reading makes the SRA's noncompete provision unenforceable. If a noncompete is overly broad as to be unreasonable—if, for example, a company has no legitimate business interest in preventing competition—it is unenforceable. *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 361 (Minn. 1998). Noncompetes are "looked upon with disfavor, cautiously considered, and carefully scrutinized." *Bennett v. Storz Broadcasting Co.*, 134 N.W.2d 892, 893 (Minn. 1965). But if a noncompete serves a legitimate employer interest and is not overly broad, courts will enforce it. *Kallok*, 573 N.W.2d at 361. Courts in Minnesota, however, have routinely upheld similar provisions involving longstanding pre-existing relationships, particularly for employees servicing customers with company products or services: the exact kind of provision at issue here. *See, e.g.*, *Esanbock v. Weyerhaeuser Co.*, 367 F. Supp. 3d 925, 937 (D. Minn. 2019). The Court thus finds no issue with the provision's breadth and declines to hold it unenforceable.

---

[4] Rosa also contends that Minnesota law exempts pre-existing relationships from noncompetes, but none of the cases he cites are applicable and the Court can find no caselaw standing for such a proposition.

## IV. CONCLUSION

For the foregoing reasons, both motions for partial summary judgment are **granted**. Shutterfly may pursue its claim for declaratory judgment and seek relief for the costs of litigation. Rosa's counterclaims are dismissed.

**SO ORDERED.**

Hartford, Connecticut
February 23, 2024

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge